**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | CR 09-0576- PHX-DGC |
| Plaintiff, | **ORDER** |
| vs. | |
| Manuel Landeros-Lopez, et al., | |
| Defendants. | |

Defendant Elisa Rojas-Cuadra has filed a motion to suppress evidence derived from a wiretap for failure to establish necessity. Dkt. #145. The motion is fully briefed. Dkt. ##182, 196. Several Defendants have joined in the motion. Dkt. ##158, 164, 126, 185. The Court heard oral argument on May 26, 2010. Based on the arguments made by counsel for Defendants, the Court will construe this motion as a motion to suppress and for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). *See Franks*, 438 U.S. at 155-56; *U.S. v. Gonzalez, Inc.*, 412 F.3d 1102 (9th Cir. 2005); *U.S. v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001); *U.S. v. Carneiro*, 861 F.2d 1171 (9th Cir. 1988); *U.S. v. Ippolito*, 774 F.2d 1482 (9th Cir. 1985). For reasons that follow, the Court will deny as moot the request for a *Franks* hearing and grant the motion to suppress.

**I.    Background.**

In mid-2008, the government began investigating suspicious cash deposits and shipping patterns of several individuals who were suspected of trafficking illegal drugs. Dkt. #145-2 at ¶¶ 16-18. The investigation, which was substantial and spanned more than

six months, included use of the following investigative techniques: queries into the identity and history of suspected traffickers through the National Crime Information Center database, Phoenix Police Department arrest records, the Phoenix Police Department PACE system, social security records, Arizona driver's license records, Arizona Public Service records, and Arizona Department of Motor Vehicle records; interviews with Bank of America security officers who had notified investigators of suspicious transactions by the suspected traffickers; witness identification of photographs of the suspected traffickers; use of a confidential informant; substantial surveillance of the residence of several of the suspected traffickers; surveillance of facilities from which the suspected traffickers made shipments; examination of shipping records; issuance of administrative subpoenas to shipping companies; use of pen registers and toll records on the telephones of the suspected traffickers; use of a drug detection dog; and examination of a parcel pursuant to a search warrant. *See* Dkt. #145-3 at 2-73. The investigation provided substantial evidence that Wayne Edward Vassel, otherwise known as "Harper," Antwann Davon Holt, and others were engaged in the business of shipping marijuana through traditional mail and parcel services and collecting proceeds from their sales through the bank accounts of various individuals whose assistance they solicited.

After using these substantial investigative techniques, investigators applied for a wiretap of Harper's telephone on December 10, 2008. *See* Dkt. #145-3 at 2-73. The affidavit filed in support of the wiretap ("the Harper affidavit") was drafted by Special Agent Jeffrey P. Lehrmann and detailed the substantial investigative techniques used before seeking the wiretap. *Id.* District Judge Neil V. Wake granted the wiretap application the same day.

On December 11, 2008, while intercepting calls from Harper's telephone, investigators learned of the existence of an individual whom investigators called "JUAN LAST NA[M]E UNKNOWN (LNU)" ("Juan"). The intercepted calls suggested that Juan was a supplier of drugs for Harper. On December 22, 2008, just 11 days after learning of Juan, the government drafted an application to the Department of Justice ("DOJ") seeking permission to wiretap a cellular telephone believed to be used by Juan in his drug trafficking activities. Juan's phone was identified in the affidavit as target telephone 3. The wiretap

application was supported by a 53-page affidavit ("the Juan affidavit") drafted by Agent Lehrmann.  Dkt. #145-2 at 2-53.

The Harper affidavit and Juan affidavit are very similar.  The "facts and circumstances of the investigation" sections are nearly identical, except that the Juan affidavit discusses the call in which investigators learned of the existence of Juan, several calls in which Juan and Harper discussed drug transactions, and the investigators' use of trap-and-trace devices and pen registers on Juan's telephone.  Dkt. #145-2 at ¶¶ 16-124.  Similarly, the "necessity" sections of the affidavits are nearly identical.  The only substantial differences between the "necessity" sections of the two affidavits are that: (1) in the Juan affidavit, "JUAN LNU" replaced the names "HARPER and HOLT"[1], and (2) in the Harper affidavit, there are additional paragraphs which contain detailed and case-specific explanations for why traditional investigative methods failed (or would fail) in producing information useful for the Harper investigation.[2]

The Juan affidavit stated that the objectives of the wiretap were (1) to gather "evidence leading to the identification, indictment and conviction of all members of the JUAN LNU Drug Trafficking Organization, and others, including but not limited to the identities and roles of accomplices, aiders and abettors, co-conspirators and participants,"

---

[1] *Compare* Dkt. #145-2 at ¶ 125 *with* Dkt. #145-3 at ¶ 109; *compare* Dkt. #145-2 at ¶ 126 *with* Dkt. #145-3 at ¶ 110; *compare* Dkt. #145-2 at ¶ 127 *with* Dkt. #145-3 at ¶ 111; *compare* Dkt. #145-2 at ¶ 128 *with* Dkt. #145-3 at ¶ 112; *compare* Dkt. #145-2 at ¶ 129 *with* Dkt. #145-3 at ¶ 113; *compare* Dkt. #145-2 at ¶ 130 *with* Dkt. #145-3 at ¶ 114; *compare* Dkt. #145-2 at ¶ 130 *with* Dkt. #145-3 at ¶ 114; *compare* Dkt. #145-2 at ¶ 131 *with* Dkt. #145-3 at ¶ 115; *compare* Dkt. #145-2 at ¶ 132 *with* Dkt. #145-3 at ¶ 116; *compare* Dkt. #145-2 at ¶ 133 *with* Dkt. #145-3 at ¶ 118; *compare* Dkt. #145-2 at ¶ 134 *with* Dkt. #145-3 at ¶ 119; *compare* Dkt. #145-2 at ¶ 135 *with* Dkt. #145-3 at ¶ 120; *compare* Dkt. #145-2 at ¶ 139 *with* Dkt. #145-3 at ¶ 126; *compare* Dkt. #145-2 at ¶ 140 *with* Dkt. #145-3 at ¶ 127; *compare* Dkt. #145-2 at ¶ 144 *with* Dkt. #145-3 at ¶ 132; *compare* Dkt. #145-2 at ¶ 145 *with* Dkt. #145-3 at ¶ 134; *compare* Dkt. #145-2 at ¶ 147 *with* Dkt. #145-3 at ¶ 137; *compare* Dkt. #145-2 at ¶ 148 *with* Dkt. #145-3 at ¶ 138; *compare* Dkt. #145-2 at ¶ 149 *with* Dkt. #145-3 at ¶ 139; *compare* Dkt. #145-2 at ¶ 152 *with* Dkt. #145-3 at ¶ 144.

[2] *See* Dkt. #145-3 at ¶¶ 117, 122, 123, 124, 125, 128, 129, 130, 136, 141, 142, 143, 145, 146.

1    (2) to identify the "various methods employed" by members of the organization "to facilitate

2    their drug distribution," (3) to identify the locations and items used by the organization "in

3    furtherance of their drug distribution activities," (4) to identify all locations and methods

4    used "to conceal" any drug-related proceeds or assets, and (5) to identify "transportation

5    routes and methods of transportation used . . . to transport controlled substances to and from

6    the District of Arizona." Dkt. #145-2 at ¶ 9. After obtaining DOJ approval, investigators

7    presented the Juan wiretap application to Judge Wake on January 22, 2009. Judge Wake

8    approved the wiretap the same day. Dkt. #145-5 at 2-8.

9        Between December 22, 2008 (when the application was sent to the DOJ for approval)

10   and January 22, 2009 (when the wiretap was approved by Judge Wake), the government did

11   not update the Juan affidavit. During this time, however, government investigators obtained

12   substantial additional information about Juan. By January 22, 2009, (1) agents strongly

13   suspected that Juan was an individual named Manual Landeros-Lopez, (2) Landeros-Lopez

14   had been linked to a particular residence by his driver's license, (3) agents had started

15   surveillance of the residence and had identified relatives of Landeros-Lopez there, and (4)

16   a tracking device had located Juan's telephone – target telephone 3 that was the subject of

17   the requested wiretap – at the residence in the early morning hours, suggesting that Juan

18   (Landeros-Lopez) was at the house and likely lived there. Dkt. #181 at 6-7. These facts

19   were not disclosed to Judge Wake in the wiretap application or the supporting affidavit. At

20   oral argument, the government conceded for purposes of this motion that these omissions

21   were reckless.

22       Through the wiretap of target telephone 3, the government intercepted numerous

23   conversations between Juan and other Defendants. Defendants now seek suppression of all

24   evidence obtained through the wiretap.

25   **II.    Legal Standard.**

26        Congress authorized the government's use of wiretaps in the Federal Wiretap Act.

27   The Act includes "elaborate procedural requirements for the initiation of wiretaps[.]" *U.S.

28   v. King*, 478 F.2d 494, 503 (9th Cir. 1973). Before a wiretap can be issued, a judge must find

that "there is probable cause for belief that an individual is committing, has committed, or is about to commit" certain offenses. 18 U.S.C. § 2518(3)(a). The government must also show that the wiretap is "necessary." Necessity exists under the Act if traditional investigative procedures (1) have been tried and failed, (2) reasonably appear unlikely to succeed if tried, or (3) are too dangerous to try. *Gonzalez, Inc.*, 412 F.3d at 1112; 18 U.S.C. § 2518(3)(c).

If a defendant challenges the affidavit used to secure a Title III wiretap, the defendant is entitled to an evidentiary hearing if she "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the [wiretap] affidavit, and if the allegedly false statement is necessary to the finding of probable cause" or necessity. *Franks*, 438 U.S. at 155-56 (probable cause); *Ippolito*, 774 F.2d at 1485 (necessity). The Supreme Court has made clear that there is "a presumption of validity with respect to the affidavit." *Franks*, 438 U.S. at 171. As a result, "[t]o justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth" or a deliberate or reckless omission of facts that tend to mislead, and "accompany such a claim with a detailed offer of proof." *U.S. v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008); *U.S. v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985).

Even after making a preliminary showing, a defendant is not entitled to a hearing if, after excising the allegedly false information from the affidavit and including the alleged omissions, "there remains sufficient content in the [wiretap] affidavit to support a finding of probable cause" or necessity. *Franks*, 438 U.S. at 172. If, "at [the] hearing the allegation of . . . reckless disregard is established by the defendant . . . and, with the affidavit's false material set to one side" and the false omissions included, "the affidavit's remaining content is insufficient to establish probable cause" or necessity, the wiretap "must be voided and the

fruits of the search excluded to the same extent as if probable cause" or necessity "was lacking on the face of the affidavit."[3] *Id.* at 157; *Ippolito*, 774 F.2d at 1485.

**III. Analysis.**

Because the government concedes for purposes of this motion that the Juan affidavit submitted to Judge Wake contained reckless omissions, there is no need for a *Franks* hearing to establish intentional or reckless falsity. *See Franks*, 438 U.S. at 155-56 (stating that the purpose of the hearing is to determine whether "the allegation of perjury or reckless disregard is established"). The issue to be decided is a legal question for the Court: whether the Juan affidavit would have been sufficient to establish necessity for the wiretap if it had disclosed all facts known about Juan. *See id.* at 171-72; *Ippolito*, 774 F.2d at 1485-86 (stating that a court must "evaluate the hypothetical effect of knowledge of the existence of [the omitted facts] on the original district court's determination that a wiretap was necessary"). The Court finds that the requisite necessity would not have existed.

As discussed above, the government can establish that a wiretap is necessary by showing that traditional investigative procedures (1) have been tried and failed, (2) reasonably appeared unlikely to succeed if tried, or (3) were too dangerous to attempt. *Gonzalez, Inc.*, 412 F.3d at 1112. If the Juan affidavit had disclosed all facts known about Juan, it would not have met any of the these standards.[4]

---

[3] In *Ippolito*, the Ninth Circuit stated that suppression of evidence obtained through an illegal wiretap is warranted if "a reasonable district court judge *could have denied* the application because necessity for the wiretap order had not been shown." 774 F.2d at 1487 (emphasis added). The Ninth Circuit followed this approach in *Carneiro*, 861 F.2d at 1180. Under *Franks*, however, the appropriate standard is not whether a reasonable judge *could have found* a lack of necessity, but whether the affidavit *was insufficient* to establish necessity or probable cause. 438 U.S. at 157, 172. This distinction is not significant for purposes of this motion, however, because the Court finds that both the lenient standard of *Ippolito* and the more stringent standard of *Franks* are satisfied.

[4] Because the government does not attempt to argue that the Juan affidavit showed that traditional methods were too dangerous, only the first two showings are relevant and will be discussed in this order.

## A. Investigative Efforts Tried Unsuccessfully.

In order to find necessity through trial and failure of traditional investigative procedures, "[a] judge must determine that ordinary investigative techniques employing a normal amount of resources [had] failed to make the case within a reasonable period of time." *U.S. v. Bennett*, 219 F.2d 1117, 1122 (9th Cir. 2000) (quotations omitted). While it is true that "the necessity requirement should not be interpreted to require law enforcement to exhaust every possible technique before resorting to the wiretapping," it should be interpreted "to ensure that in the usual case wiretapping is not used as the first meaningful step in an investigation." *Gonzalez, Inc.*, 412 F.3d at 1113.

The government argues that the Juan affidavit, even including all reckless omissions and excluding all material misstatements, would have shown that traditional measures had been tried and had failed. The government contends that the substantial investigation into the activities of Harper – which clearly included numerous traditional techniques – was sufficient to provide the requisite necessity for the Juan wiretap. The Court disagrees. While it is true that investigators had conducted substantial investigation into the activities of Harper before seeking the Juan wiretap, that investigation was not sufficient to show that traditional techniques had been tried unsuccessfully against Juan.

The Ninth Circuit cases of *Carneiro* and *Gonzalez, Inc.* are particularly instructive. *Carneiro*, 861 F.2d 1171; *Gonzalez, Inc.*, 412 F.3d 1102. In *Carneiro*, the government conducted a substantial investigation into a cocaine and marijuana trafficking ring. 861 F.2d at 1171. After spending several months investigating four particular suspects, the government sought to wiretap the telephones of two of the suspects, McNeil and Harty. Through the interception of calls made to and from Harty's telephone, the government learned that an individual named Thomas Boyd was Harty's supplier. Soon after learning of Boyd, the government sought and obtained a wiretap of Boyd's telephone. Through the Boyd wiretap, the government obtained substantial information that assisted in the conviction of Boyd. Before trial, Boyd sought to suppress the information obtained through the wiretap

on the ground that the government had failed to show necessity, but the district court denied the motion.

On appeal, the Ninth Circuit held that the information obtained through the Boyd wiretap should have been suppressed. Of particular importance to the Ninth Circuit was the fact that the previous investigation of McNeil and Harty was not sufficient to show that the government had tried to use traditional investigative techniques against Boyd before it sought the wiretap. The Ninth Circuit held that even when the government is investigating a conspiracy "there must be a showing of necessity with respect to each telephone and conspirator." *Id.* at 1182. The government must investigate each conspirator before seeking to wiretap that individual's telephone. The government cannot piggy-back a subsequent wiretap on the necessity established for a previous wiretap. *Id.* at 1181-83.

Similarly, in *Gonzalez, Inc.*, the government was conducting a substantial, multi-year investigation into a conspiracy to smuggle aliens into the United States using GST, a public bus company. 412 F.3d at 1102. During the initial investigation, the government used pole cameras, physical surveillance, undercover agents, and other traditional methods to gather evidence at the Phoenix and Tucson bus terminals of GST. After substantial use of these techniques, the government sought a wiretap of the telephones of the Phoenix and Tucson bus terminals, which was granted. Through these wiretaps, the government intercepted a call from the founder of GST in the Los Angeles head office.

Based on this call, the government conducted a brief investigation of the Los Angeles office. It collected five days of pen registers on the office's telephones and five days of trap-and-trace analyses of the telephones. The government also conducted limited physical surveillance of the office and made a preliminary inquiry into the possibility of placing an undercover agent there. After this limited investigation, the government sought a wiretap of the Los Angeles office's telephones, which was granted.

On appeal, the Ninth Circuit held that the wiretap affidavit failed to show that law enforcement had adequately pursued traditional investigative methods. Of particular importance was the fact that investigators, after learning that the Los Angeles office might

be involved in the conspiracy, did not conduct an adequate, individual investigation of the Los Angeles office, but instead sought a wiretap based on the past failure of investigative methods at the Phoenix and Tucson bus terminals. The Ninth Circuit held that the attempt to piggy-back the Los Angeles office wiretap on the substantial investigation of the Phoenix and Tucson terminals was insufficient to show necessity.

Under *Carneiro* and *Gonzalez, Inc.*, the necessity required for the wiretap of Juan's telephone cannot be supplied by the Harper investigation. Necessity must be shown by the fact that traditional investigative techniques had been tried unsuccessfully against Juan. The Juan affidavit did not make this showing, and could not have made it if all omitted facts had been included.

An accurate affidavit would have shown that in just over one month since Juan was heard talking to Harper on intercepted calls, traditional investigative techniques had caused agents to conclude that Juan was probably Manual Landeros-Lopez, had helped them identify his likely place of residence, and had enabled them to trace his telephone to the residence in the early morning hours. Agents had been conducting limited surveillance of his residence for 11 days or so, but already had connected him to Defendants Joel Landeros-Gomez and Jose Cuadra. *See* Dkt. #181 at 6, 8-9. The affidavit would have shown that agents had not used most of the traditional investigative techniques used in the Harper investigation, as described earlier in this order. Moreover, an accurate affidavit would have shown that traditional techniques had not been tried for "a reasonable period of time." *See Bennett*, 219 F.3d at 1122. The government sought DOJ permission to wiretap Juan's phone only 11 days after learning of his existence.

The entire pre-wiretap investigation of Juan consisted of a toll records analysis, a pen register, some limited (but undisclosed) physical surveillance of the Landeros-Lopez home, and some investigation into the criminal record of Landeros-Lopez and other co-Defendants. This simply is not a sufficient use of traditional investigative techniques to make a wiretap necessary. Other traditional measures such as trash searches, pole cameras, and data base inquiries had not been used. *Gonzalez, Inc.*, 412 F.3d at 1113 (finding a lack of necessity

where government had been conducting surveillance at location for only five days before resorting to a wiretap); *Blackmon*, 273 F.3d at 1210 (the use of pen registers and trap-and-trace devices as the only investigative technique employed between the granting of an initial wiretap and the application for a subsequent wiretap was insufficient).

But even if the government's investigation of Juan could be said to clear the minimum threshold for necessity, they were not unsuccessful. They had borne substantial fruit. Between December 22, 2008 and January 22, 2009, the government learned the following information, all of which was obtained through traditional means: that Juan was frequently calling Defendant Elisa Cuadra-Rojas (Dkt. #181 at 3), the residential address of Cuadra-Rojas (Dkt. #181 at 3), the criminal record of Cuadra-Rojas which tended to show a likelihood of money laundering (Dkt. #181 at 3), that Defendant Manuel Landeros-Lopez was connected to Cuadra-Rojas and her address (Dkt. #181 at 5), that Juan was likely Landeros-Lopez given that Juan's telephone was tracked to Landeros-Lopez's home in the early morning hours (Dkt. #181 at 6-7), that Landeros-Lopez was connected to Defendant Jose Cuadra because a vehicle was driven from the Landeros-Lopez home to Cuadra's home (Dkt. #181 at 8), and that Landeros-Lopez was connected to Defendant Joel Landeros-Gomez because he was seen at the Landeros-Lopez home (Dkt. #181 at 8). The affidavit could not truthfully claim that traditional techniques had been tried and had failed.

What is more, the Juan affidavit affirmatively asserted that agents were unable to identify Juan or his residence and needed a wiretap to do so. Dkt. #145-2 at ¶¶ 138, 143. These were plainly inaccurate assertions. The true identity of Juan may not have been known when the initial wiretap application was made to DOJ in December, but Juan had been linked to Landeros-Lopez and the residence under surveillance by the time Judge Wake was asked to authorize the wiretap in January. To the extent the affidavit claimed that a wiretap was necessary to identify Juan and where he lived, it was simply false.

The government was not required to exhaust all possible investigative techniques before seeking a wiretap of Juan's telephone, but it was required to use traditional techniques for a reasonable period of time without success. The government failed to do so. As a result,

the affidavit was (and would have been if complete) insufficient to establish necessity through the tried-and-failed approach. *See Bennett*, 219 F.3d at 1122.

## B. Unlikely to Succeed.

To show that traditional methods would not be likely to succeed, an affidavit must "allege specific circumstances that render normal investigative techniques particularly ineffective[.]" *Ippolito*, 774 F.2d at 1486. Boilerplate assertions that "are unsupported by specific facts relevant to the particular circumstances of [the] case" are not sufficient. *Blackmon*, 273 F.3d at 1210.

Had the Juan affidavit disclosed all relevant facts regarding the investigation of Juan and his organization, the government would have had great difficulty showing that traditional procedures were unlikely to succeed. As already noted, traditional methods had been quite successful during the month they had been used.

The government argues that the traditional methods, though useful to a limited extent, simply would not have achieved its broad objective – to identify all participants in Juan's criminal activity enterprise, all locations and methods used by his organization, all transportation routes, and to gather sufficient evidence to indict and convict members of the organization. Dkt. #145-2 at ¶ 129. Even if the Juan affidavit had included recent developments in the investigation, the government argues, it would have shown necessity because, as explained in paragraphs 132 through 153 of the affidavit, traditional techniques never would have achieved these broad objectives.

The Ninth Circuit has held, however, that broad objectives cannot be used to uphold what would otherwise be an unnecessary wiretap. *Blackmon*, 273 F.3d at 1210. In *Blackmon*, the government conducted a substantial narcotics investigation which included numerous suspects. In April of 1997, after six months of traditional investigatory techniques, the government requested a wiretap of Maurice Miller, a suspected narcotics trafficker. The wiretap produced evidence that resulted in charges against Miller and others. Three subsequent wiretaps were also obtained through information gathered in the Miller wiretap. These wiretaps involved telephones primarily used by Rodney Blackmon. The Blackmon

wiretaps produced substantial evidence of criminal activity. Blackmon sought to suppress the wiretap evidence, alleging that the government failed to show necessity. The district court declined to suppress the evidence and Blackmon appealed.

The Ninth Circuit held that the wiretap evidence against Blackmon should have been suppressed for two reasons: (1) the application, which was nearly a carbon copy of a previous application for a different suspect, contained material misstatements and omissions regarding the necessity for the wiretap, and (2) once purged of all the material misstatements and omissions as required by *Ippolito*, the application contained only generalized statements that would be true of any narcotics investigation. *Id.* at 1208. In particular, the Ninth Circuit took issue with the affidavit's "generalized investigative purpose," which was as follows:

> While [traditional] techniques are useful in establishing various aspects of the criminal enterprise, they have not been, and are not likely to be sufficient to produce the evidence necessary to identify *all the participants in this cocaine trafficking organization and to result in the successful prosecution of these individuals for their full involvement in this criminal enterprise.*

273 F.3d at 1210 (emphasis in original). Based on this broad investigative purpose, the government stated in the affidavit that various traditional methods had failed or would fail. The government stated that confidential informants would be insufficient because they "typically only possess limited knowledge concerning the scope of the criminal enterprise." *Id.* It stated that pen registers would not be adequate because those "records only provide evidence that the telephone was used, without showing the identity of the callers or the nature or purpose of those communications." *Id.* The government contended that search warrants and witnesses would be ineffective because they "would be unlikely to produce evidence which would identify fully the other members of the organization, the organizational structure, the scope of the narcotics trafficking conspiracy, or the sources of supply" and because "interviews of witnesses [would] not be successful in developing sufficient evidence to prosecute this entire organization." *Id.*

The Ninth Circuit found that these statements "would be true of most or all drug conspiracy investigations," merely described "the inherent limitations" of certain techniques,

and were "unsupported by specific facts relevant to the particular circumstances of this case[.]" *Id.* The following language from *Blackmon* applies directly to this case:

> That pen registers do not reveal the identity of callers; that drug dealers know it is in their best interest to reveal as little as possible; that witnesses cannot lead to the prosecution of an entire drug organization; and that traditional investigative methods do not reveal all are generic problems of police investigation. Their generic nature does not dissipate simply because the government claims a vast investigative purpose. Wiretaps themselves could little achieve the investigative goals stated in the government's application. The government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances.

*Id.* at 1211.

The broad language used in the Blackmon affidavit is very similar to the broad language used in the Juan affidavit. Indeed, the purposes listed in the Juan affidavit are even broader than those in the Blackmon affidavit, as they include not only a desire to find and successfully prosecute all members of the Juan drug trafficking organization, but also a desire to obtain substantial information about the organization's techniques, methods, and practices. Dkt. #145-2 at ¶ 129. Such a broad purpose, supported only by a discussion of generic shortcomings in traditional law enforcement techniques, does not establish necessity under *Blackmon*.

The Juan affidavit's explanation for why traditional methods would not work in this case are also similar to those asserted in *Blackmon*. For instance, the affidavit contends that undercover agents would not work because "drug trafficking organizations like the JUAN LNU organization are compartmentalized and follow a strict operational hierarchy such that the suppliers, transporters, distributors, customers, and money launderers generally have little or no interaction," meaning that "even highly placed confidential informants . . . could likely not gain knowledge of the full scope of a organization s [sic] narcotics and currency stash houses, personnel, and day-to-day trafficking activities." Dkt. #145-2 at ¶ 133. Similarly, the affidavit contends that trash runs would not be useful because "high-level narcotics traffickers go to great lengths to destroy possibly incriminating evidence and frequently will not use their residential trash containers to dispose of valuable information." *Id.* at ¶ 152. As in *Blackmon*, these explanations "would be true of most or all drug conspiracy

investigations" and "are unsupported by specific facts relevant to the particular circumstances of this case[.]" 273 F.3d at 1210-11.

To the extent that the Juan affidavit actually included specific facts relevant to the circumstances of this case, those facts were untrue as of the date that the wiretap was authorized. For instance, the Juan affidavit stated that physical surveillance or trash runs would not work because, "[a]t this time, [investigators] [have] been unable to positively identify JUAN LNU, therefore unable to utilize surveillance resources in an attempt to further investigate JUAN LNU." Dkt. #145-2 at ¶¶ 138, 151. The affidavit did not disclose that agents were at that very time conducting surveillance of the Landeros-Lopez residence where Juan's telephone had been located. Similarly, the Juan affidavit stated that investigators had to rely on wiretaps rather than pen registers or trap-and-trace devices because the government had been unable to use the subscriber information for target telephone 3 to identify Juan. *Id.* at ¶ 145. It did not disclose that agents had largely succeeded in identifying Juan and were watching his house.

The government urges the Court to find that necessity would have existed because the Ninth Circuit has "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of suppliers, major buyers or other satellite conspirators." *U.S. v. Torres*, 908 F.2d 1417, 1422 (9th Cir. 1990). The government contends that the Ninth Circuit has allowed a finding of necessity where wiretaps are important to the development of an effective case. *See U.S. v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986). In support of this argument, the government cites numerous cases. *See Torres*, 908 F.2d at 1422; *Brone*, 792 F.2d at 1506; *U.S. v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002); *U.S. v. Bennett*, 219 F.3d 1117, 1121-22 (9th Cir. 2000); *Carneiro*, 861 F.2d at 1178. In these cases, however, the Ninth Circuit was not determining whether necessity had been shown in an affidavit, but whether the issuing judge abused his or her discretion in determining that necessity existed. *See Torres*, 908 F.2d at 1422 (Ninth Circuit conducting an abuse of discretion review of the granting of a wiretap application, and not making a determination pursuant to *Ippolito* or

*Franks*); *Brone*, 792 F.2d at 1506 (same); *McGuire*, 307 F.3d at 1198 (same); *Bennett*, 219 F.3d at 1121-22 (same); *Carneiro*, 861 F.2d at 1178 (same as to the wiretap discussion relied upon by the government in its brief). The question of whether necessity is shown after false omissions are excised and omitted information is included pursuant to *Franks* and *Ippolito* is not subject to deferential abuse of discretion review, but instead is reviewed de novo. *Franks*, 438 U.S. at 157, 172.

Finally, the Juan affidavit stated that traditional techniques likely would succeed once Juan's residence was found. Dkt. #145-2 at ¶ 142. Since the residence had been found, this amounts to an admission that such techniques would have worked.

In summary, affidavits in support of wiretaps must deal in truthful specifics, not in untruthful specifics or vague generalities. The affidavit must show why traditional investigative techniques are or would be ineffective in the case at hand, not why such techniques are less than optimal in broad categories of cases. As the Ninth Circuit explained in *Ippolito*:

> The reason for requiring specificity is to prevent the government from making general allegations about classes of cases and thereby sidestepping the requirement that there be necessity in the particular investigation in which a wiretap is sought. The District of Columbia Circuit observed that:
>
>> we must be careful not to permit the government merely to characterize a case as a "drug conspiracy" . . . that is therefore inherently difficult to investigate. The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail.
>
> *United States v. Robinson*, 698 F.2d 448, 453 (D.C.Cir.1983) (per curiam) (emphasis in original).

*Ippolito*, 774 F.2d at 1486.

The assertions of necessity in the Juan affidavit were not based on specifics. Rather, the affidavit asserted that drug conspiracies generally are difficult to investigate. If the affidavit had dealt in specifics, and if it had disclosed the specifics of this case truthfully, it would have defeated necessity by showing that traditional techniques were working and had been employed only for a short time.

## IV.    Conclusion.

Necessity is not a mere technicality.  Wiretaps are among the most intrusive of investigative tools, and Congress appropriately has concluded that they should be used only when truly necessary.  For these reasons, courts must suppress wiretaps obtained without the required showing of necessity.  18 U.S.C. § 2515 (codifying the "fruit of the poisonous tree" doctrine for improperly obtained wiretaps).

When the wiretap of target telephone 3 was obtained in this case, the investigation of Juan was in its early stages and traditional techniques were bearing fruit.  It simply was not truthful to suggest that traditional techniques had been tried for a reasonable period of time without success, nor was it accurate to suggest that such techniques were unlikely to succeed.  Although it may always be said that traditional techniques have limited utility against sophisticated drug trafficking organizations, the Ninth Circuit clearly has held that this fact does not establish necessity.  The government must use traditional techniques without success or must explain, on the basis of facts specific to the case at hand, why they would not work.  The government in this case did neither.  Evidence obtained through the wiretap of target telephone 3, including all evidence derived therefrom, must therefore be suppressed.

**IT IS ORDERED:**

1.    Defendant's motion to suppress (Dkt. #145) is **granted**.

2.    Defendant Elisa Rojas-Cuadra's motion to suppress evidence derived from unlawful recordings for failure to minimize (Dkt. #147) is **denied as moot**. This motion seeks to suppress the same telephone calls which will be suppressed as a result of this order.

3.    Defendant Elisa Rojas-Cuadra's motion to dismiss Counts One, Two, and Three of the indictment based on the unlawful recording of privileged calls (Dkt. #146) is **denied**.  In that motion, Rojas-Cuadra seeks dismissal of the indictment as a remedy for the government's failure to minimize the interceptions of target telephone 3 to avoid maritally-privileged

communications between herself and Landeros-Lopez. Because these telephone calls will be suppressed as a result of this order, the Court will decline to invoke its supervisory powers which permit it to dismiss an indictment for government misconduct that does not rise to the level of a constitutional violation. *See U.S. v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008).

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to commence on April 16, 2010 for a total of 55 days.

DATED this 9th day of June, 2010.

David G. Campbell
United States District Judge